**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS,
*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, Animal and Plant
Health Inspection Service,
*Defendant-Appellee*.

No. 13-16071

D.C. No.
2:12-cv-00716-
MMD-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Miranda Du, District Judge, Presiding

Argued and Submitted
March 9, 2015—San Francisco, California

Filed August 3, 2015

Before: M. Margaret McKeown, Mary H. Murguia, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's order dismissing a case brought by WildEarth Guardians, alleging violations of the National Environmental Policy Act, and seeking to enjoin the federal government's participation in the killing of predatory animals in Nevada.

The district court dismissed for lack of standing, holding that WildEarth had not shown that its alleged injuries were caused by the government's reliance on a decades-old programmatic environmental impact statement ("PEIS"); and that, in any event, WildEarth's injuries were not redressable where Nevada could choose to implement an independent predator damage management program if the federal government ceased its activities.

The panel held that both of the district court's reasons for dismissal were erroneous. Concerning Claims One and Two, which challenged the government's failure to supplement the 1994/1997 PEIS for its predator damage programs nationwide, the panel held that the injuries WildEarth member Don Molde alleged were concrete enough, and were sufficiently causally related to the government's failure to update the PEIS, to support WildEarth's standing for those claims.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Concerning Claims Three and Four, which alleged that the government violated the National Environmental Policy Act by preparing an inadequate environmental assessment for Nevada and consequently failing to prepare a Nevada-specific Environmental Impact Statement, the panel held that the standing requirements were met and WildEarth member Don Molde's injury was redressable. The panel held that the mere existence of multiple causes of an injury did not defeat redressability, particularly for a procedural injury.

## COUNSEL

Ashley D. Wilmes (argued), WildEarth Guardians, Louisville, Colorado, for Plaintiff-Appellant.

Robert G. Dreher, Acting Assistant Attorney General; Emily A. Polachek (argued), Andrew C. Mergen, J. David Gunter II, and Brian Collins, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Annalisa Jabaily, and Lauren Axley, United States Department of Agriculture, Office of General Counsel, Washington, D.C., for Respondent-Appellee.

Rebecca J. Riley, Natural Resources Defense Council, Chicago, Illinois, for Amici Curiae Natural Resources Defense Council, Defenders of Wildlife, Predator Defense, TrailSafe Nevada, Northeast Oregon Ecosystems, Center for Biological Diversity, Southwest Environmental Center, Friends of Animals, Mark E. Smith Foundation, Western Watersheds Project, and Boulder-White Clouds Council.

Thomas M. Gremillion and Hope M. Babcock, Institute for Public Representation, Washington, D.C., for Amici Curiae Professors of Environmental Law.

**OPINION**

FRIEDLAND, Circuit Judge:

Environmental organization WildEarth Guardians sued to enjoin the federal government's participation in the killing of predatory animals in Nevada. WildEarth alleged that the program's continued reliance on a decades-old programmatic environmental impact statement ("PEIS") causes the government to use outdated and unnecessarily harmful predator control techniques that interfere with WildEarth's members' enjoyment of outdoor activities. The district court dismissed for lack of standing, holding that WildEarth had not shown that its alleged injuries were caused by the government's reliance on the PEIS, and that, in any event, Nevada could choose to implement an independent predator damage management program if the federal government ceased its activities, so WildEarth's injuries were not redressable. Both of these reasons for dismissal were erroneous, so we reverse.

## I.  Background

### A.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires federal agencies to assess and publicly disclose the environmental impacts of proposed federal actions. 42 U.S.C. §§ 4321-4347.  For federal actions that

"significantly affect[] the quality of the human environment," the agency must develop an environmental impact statement ("EIS") that "provide[s] full and fair discussion of significant environmental impacts" and "inform[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.1. When it is unclear whether the federal action will have a significant effect on the environment, the agency must prepare an "environmental assessment" to determine whether an EIS is required. 40 C.F.R. § 1501.4(b). If, after completing the environmental assessment, the agency decides not to prepare an EIS, the agency must prepare a "finding of no significant impact" to explain its decision. *Id.* § 1501.4(e).

An agency with an existing EIS must supplement it if the "agency makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(c)(1). "If there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989) (brackets omitted).

## B. APHIS and Its 1994/1997 Programmatic Environmental Impact Statement

The United States Department of Agriculture is authorized to protect the nation's agricultural resources from damage associated with predatory wildlife. *See* 7 U.S.C. §§ 426-426c. The Department's Animal and Plant Health Inspection Service ("APHIS") carries out wildlife control programs through Wildlife Services.[1] *See* 7 C.F.R. §§ 371.6, 371.11. APHIS conducts its programs in cooperation with other federal, state, and local agencies, as well as with private organizations and individuals.

In 1994, APHIS assessed the environmental impact of its full program of ongoing wildlife damage control nationwide and issued an EIS, referred to as a "programmatic EIS" ("PEIS"). The PEIS was revised in 1997 to make technical corrections. The 1994/1997 PEIS discusses thirteen alternatives for wildlife management and identifies a preferred approach—the "Current Program Alternative."[2] Rather than requiring the preferred approach to be implemented nationwide, however, the Record of Decision for the PEIS identifies five "viable alternatives discussed" in

---

[1] Wildlife Services was formerly called Animal Damage Control.

[2] The Record of Decision in the Federal Register defines this alternative: "The current program (the integrated pest management alternative) . . . consists of various practices and techniques, including both nonlethal and lethal actions, that are available for formulating a damage control strategy consistent with applicable State and local requirements, cooperative agreements, and interagency arrangements." Animal Damage Control Program, Record of Decision Based on Final Environmental Impact Statement, 60 Fed. Reg. 13399, 13400 (Mar. 13, 1995).

the PEIS and states that they would be forwarded to regional and local decision makers "for consideration as management approaches."  Animal Damage Control Program, Record of Decision Based on Final Environmental Impact Statement, 60 Fed. Reg. 13,399, 13,400 (Mar. 13, 1995).

## C.  Predator Damage Control Activities in Nevada

APHIS and the Nevada Department of Wildlife currently share responsibility for predator damage control in Nevada. Together, the two form the Nevada Wildlife Services Program ("NWSP").  NWSP has been conducting predator damage management in Nevada for over eighty years. APHIS provides significant funding, staffing, and supervision for NWSP's activities.  Nevada also provides some funding and personnel.

In 2010, the then-Director of the Nevada Department of Wildlife, Kenneth Mayer, wrote a letter to APHIS (the "Mayer Letter") stating that, if APHIS stopped conducting predator damage management in Nevada, the Nevada Department of Wildlife would retain statutory responsibility for wildlife control and would either "carry out the management of wildlife with existing personnel or contract the work to other capable entities."

In June 2011, APHIS issued an environmental assessment for NWSP's ongoing predator damage management program in Nevada.  The 2011 environmental assessment incorporated by reference APHIS's 1994/1997 PEIS.

The assessment considered five alternatives for predator management in Nevada, including ending federal involvement.  The assessment stated that, if federal

involvement ceased, Nevada likely would engage in some predator damage management, but that it was "unlikely" that Nevada would conduct predator control at the level of the current program. The assessment noted that the effects on the environment of ceasing federal involvement were uncertain because they would depend on the actions of private individuals, who might attempt predator management on their own. The assessment nevertheless made some predictions about the likely rates of certain methods of predator control. Specifically, the assessment stated that the killing of ravens (a Nevada predator) "would be likely to decrease substantially" because Nevada would not have access to the same avicide used by APHIS. The assessment further hypothesized that ending federal involvement would greatly reduce aerial hunting of predator species, but would increase other forms of predator hunting.

Ultimately, the 2011 environmental assessment concluded that continuing the joint APHIS-Nevada predator damage management program would not have significant environmental impacts, but that monitoring of the program's impacts on wildlife populations should continue. APHIS issued a finding of no significant impact and therefore did not order a Nevada-specific EIS.

## D. Litigation History

WildEarth sued APHIS in 2012, asserting four claims based on alleged violations of NEPA and one claim under the Wilderness Act, 16 U.S.C. § 1131 *et seq*. WildEarth sought injunctive and declaratory relief. WildEarth alleged that the data, science, and analysis used in the PEIS were based on studies from the 1970s and 1980s that have been called into question by more recent research. Claims One and Two alleged, respectively, that APHIS's failure to

supplement the 1994/1997 PEIS for its predator damage programs nationwide is (1) arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedures required by law, 5 U.S.C. § 706(2)(A), (D); and (2) an agency action unlawfully withheld or unreasonably delayed, *id.* § 706(1). Claim Three alleged that the 2011 Nevada environmental assessment was inadequate under NEPA, and Claim Four alleged that the 2011 Nevada finding of no significant impact was arbitrary and capricious, or without observance of procedures required by law, *id.* § 706(2)(A), (D). Claim Five alleged that the NWSP's aerial hunting practices violate the Wilderness Act.

APHIS moved to dismiss Claims One through Four under Federal Rule of Civil Procedure 12(b)(1) for lack of standing, arguing that WildEarth had not alleged that any of its members had suffered a concrete, redressable harm. APHIS additionally asserted that Claims One, Two, and Five should be dismissed under Rule 12(b)(6) for failure to state a claim.

In response to APHIS's motion to dismiss, WildEarth submitted a declaration from Don Molde, a WildEarth member, who engages in outdoor recreation in parts of Nevada affected by NWSP's predator control.[3] Molde's declaration described his frequent recreational use of areas in Nevada impacted by NWSP's activities, his plans to continue visiting those areas, and the negative effect of

---

[3] WildEarth also submitted a declaration from another member, George Weurthner, whose injuries were substantially the same as Molde's for purposes relevant here. For convenience, and because Molde's injuries are sufficient to support standing, we discuss only Molde's declaration.

NWSP's predator damage management on his recreational and aesthetic enjoyment of the impacted areas. For example, Molde stated that he has curtailed his walks with his dog for fear that the dog would be caught in NWSP's predator traps. Molde further described how NWSP's activities reduce the number of ravens that he is able to observe during his bird-watching, and how NWSP's aerial hunting practices reduce his chances of seeing coyotes.

The district court dismissed Claims One through Four for lack of standing. With respect to Claims One and Two, the district court concluded that WildEarth had not alleged a sufficiently concrete injury traceable to APHIS's 1994/1997 PEIS. Regarding Claims Three and Four, the district court concluded that WildEarth's injury was not redressable because the Mayer Letter indicated that Nevada would carry out predator damage management even if APHIS was enjoined from engaging in predator control in Nevada.

The district court denied the motion to dismiss Claim Five, but WildEarth then voluntarily dismissed that claim so that it could immediately appeal the standing holdings.

## II. Standard of Review

"We review a motion to dismiss for lack of standing de novo, construing the factual allegations in the complaint in favor of the plaintiffs." *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013). A plaintiff has the burden to establish that it has standing. *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008).

## III.    Discussion

To establish standing, a plaintiff must show that "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Salmon Spawning*, 545 F.3d at 1225 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

To demonstrate standing to bring a procedural claim—such as one alleging a NEPA violation—a plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011). For an environmental interest to be "concrete," there must be a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Id.* "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000). Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, "the causation and redressability requirements are relaxed." *W. Watersheds Project*, 632 F.3d at 485. "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Salmon Spawning*, 545 F.3d at 1226.

## A.  The Claims Challenging the 1994/1997 PEIS

The district court dismissed Claims One and Two, holding that WildEarth had not shown that any of its members had a concrete injury caused by the PEIS.  But the injuries Molde alleges are concrete enough, and are sufficiently causally related to APHIS's failure to update the PEIS, to support WildEarth's standing for Claims One and Two.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  As to the second and third prongs, it is clear that Molde's interest in recreational and aesthetic enjoyment of predators in the Nevada wilderness is related to WildEarth's purposes of "protecting and restoring wildlife" and "carnivore protection."  And neither WildEarth's claims for procedural violations of NEPA nor its requested relief require the participation of any individual WildEarth members.  The only dispute is over the first prong—whether the harm to Molde satisfies the concrete injury-in-fact, causation, and redressability requirements for standing.  We therefore focus on those issues.

Molde's injury is his reduced recreational and aesthetic enjoyment of areas in Nevada impacted by NWSP's predator damage management programs.  His declaration names specific wilderness areas in Nevada that he has visited and has specific plans to visit again.  The declaration states that

NWSP's predator control negatively impacts Molde's enjoyment of those areas by causing him to curtail his recreational activities and reducing his likelihood of seeing predators, including coyotes and ravens. This satisfies the injury-in-fact requirement. *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707–08 (9th Cir. 2009) (holding that a declaration from plaintiffs that they have viewed animals in the affected region previously, enjoy doing so, and have plans to return satisfies the requirement for a concrete injury in fact with geographic nexus to the challenged action).

Because WildEarth seeks to enforce a procedural right under NEPA, the requirements for causation and redressability are relaxed. *W. Watersheds Project*, 632 F.3d at 485. Under that relaxed standard, WildEarth's allegations, based on Molde's experience, are sufficient to support standing. WildEarth alleges that APHIS implements its predator damage management programs pursuant to the 1994/1997 PEIS, and that APHIS has improperly failed to update that PEIS. The Record of Decision for the final PEIS specifically states that APHIS will rely on information from the final PEIS for NEPA compliance. 60 Fed. Reg. 13,399, 13,400. Indeed, the Nevada environmental assessment did incorporate the 1994/1997 PEIS. This is a sufficient causal link between APHIS's alleged procedural violations of NEPA and Molde's injury to satisfy the relaxed causation requirement for procedural claims. *See Salmon Spawning*, 545 F.3d at 1229 (holding that causation is satisfied under the relaxed requirements for procedural claims when "[t]he asserted injury is not too tenuously connected to the agencies' failure" to take action).

Contrary to APHIS's arguments, the fact that the PEIS also applies to programs in states for which WildEarth has

not submitted member declarations does not prevent WildEarth from challenging the continued use of the PEIS. WildEarth has adequately alleged that Molde's injury in Nevada is caused by the failure to update the PEIS, which is sufficient to allow WildEarth to challenge that failure to update. That the PEIS also applies to other geographic regions that Molde does not visit is irrelevant to the standing analysis. *See Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1303 (9th Cir. 1994) ("[I]f plaintiffs did not have standing to challenge a non-site-specific EIS, the program as a whole could never be reviewed. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge."); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1515-18 (9th Cir. 1992) (holding that the plaintiffs had standing to challenge a non-site-specific EIS that caused their injury in fact); *see also Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 985 (9th Cir. 1994) (upholding standing for challenge to statewide failure to regulate water quality when the plaintiffs alleged specific injury relating to some, but not all, streams within Alaska).

Molde's injury also satisfies the relaxed redressability requirement for procedural claims. This requirement is satisfied when "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." *Salmon Spawning*, 545 F.3d at 1226. This relaxed redressability standard governs procedural challenges to programmatic actions as well as to specific implementing actions. *See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, Nos. 13-35624, 13-35631, 2015 WL 3756708, at *6 (9th Cir. June 17, 2015) ("As in *Salmon Spawning*, Cottonwood's allegation of a procedural injury relaxes its burden of showing causation and redressability.

Cottonwood need not show that [the procedures sought] would lead to a different result at either the programmatic or project-specific level.") (internal citation omitted). Here, updating the PEIS *could* influence APHIS's predator damage management in Nevada, which is sufficient to satisfy the redressability requirement for standing for a procedural claim.

Because Molde would have standing to bring Claims One and Two on his own, and WildEarth also satisfies the other associational standing requirements, WildEarth has standing for Claims One and Two.[4]

### B. The Nevada-Specific Claims

Claims Three and Four allege that APHIS violated NEPA by preparing an inadequate environmental assessment for Nevada and consequently failing to prepare a Nevada-specific EIS. In support, WildEarth argues that APHIS's Nevada analysis was deficient because, among other things, it failed to analyze the environmental impacts of trapping, aerial hunting, and avicide use—all practices that Molde contends negatively impact his aesthetic and recreational enjoyment of affected areas in Nevada. The district court dismissed these claims for lack of

---

[4] APHIS alternately asks us to affirm the district court's dismissal of Claims One and Two under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The district court has yet to address this issue, and we decline to reach it in the first instance. *See Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Alaska Longshore Div., Unit 60*, 721 F.3d 1147, 1157 (9th Cir. 2013) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.").

redressability. Specifically, the district court held that the Mayer Letter, which asserted that Nevada would perform predator damage management independently if APHIS were to withdraw from Nevada, demonstrated that enjoining APHIS would not redress WildEarth's injury.

For the same reasons discussed above, WildEarth meets the injury-in-fact and causation requirements for standing to challenge APHIS's predator damage management activities in Nevada based on Molde's injuries, as well as the other requirements for associational standing. The only question in dispute is whether Molde's injury is redressable. We hold that it is.

APHIS argues that, if WildEarth prevailed on Claims Three and Four, APHIS would have to cease its predator management activities in Nevada altogether at least until a new environmental assessment was completed. On the basis of this premise, which we accept as true,[5] APHIS's primary argument against redressability is that, if federal involvement in predator management in Nevada ceased as a result of this lawsuit, Nevada would pick up where the federal government left off. APHIS argues that Nevada's current participation in NWSP's predator control activities and its legal authority to conduct predator control make Nevada an independent cause of the underlying injury,

---

[5] We note that if APHIS's activities would only be altered rather than halted if WildEarth prevailed, there is no question that WildEarth's injury would be redressable. Partial relief through a reduction in APHIS's activities would qualify as redress for standing purposes, *Meese v. Keene*, 481 U.S. 465, 476–77 (1987), and APHIS has not even argued that Nevada would step in to fill a gap left by a reduction in federal activity rather than a cessation.

rendering Molde's injury not redressable by relief against APHIS. But the mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury. So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.

The Supreme Court applied this principle in *Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007). Massachusetts, along with several other plaintiffs, had brought a procedural challenge to EPA's failure to regulate greenhouse gas emissions from new motor vehicles. *Id.* at 505. The underlying concrete injury—harms to Massachusetts and its citizens from climate change caused by greenhouse gas emissions—had multiple causes. EPA pointed to the fact that there were numerous contributors to greenhouse gas emissions, including developing nations such as China and India. *Id.* at 523–24. EPA further argued that "predicted increases in greenhouse gas emissions from developing nations . . . [were] likely to offset any marginal domestic decrease" that would result from the type of regulations Massachusetts sought. *Id.* Nevertheless, the Court held that Massachusetts satisfied the relaxed redressability requirement for procedural claims because a favorable decision by the EPA could reduce "to some extent" the risk posed by global warming. *Id.* at 526.

In *Salmon Spawning*, we likewise held that the plaintiffs had standing to bring a procedural claim for prospective relief based on the United States' alleged failure to engage in procedures under the Endangered Species Act that might lead to changes in future salmon harvesting practices. 545 F.3d at 1229. Although salmon harvesting was carried out by both the United States and Canada pursuant to the terms

of a treaty, the existence of two causes of the plaintiffs' injury did not defeat redressability.**[6]** *Id.*

Similarly, in *Barnum Timber Co. v. EPA*, we held that a litigant challenging an agency action "need not eliminate any other contributing causes to establish its standing." 633 F.3d 894, 901 (9th Cir. 2011). The relevant inquiry is instead whether a favorable ruling could redress the challenged cause of the injury. *See id.* Specifically, in *Barnum* we concluded that a landowner had standing to sue EPA because EPA regulations decreased the landowner's property's value, even though California also regulated the property in question. *Id.* at 900–01 & n.4. We stated that "[w]hether Barnum might have a cause of action against California does not affect whether Barnum has standing to sue EPA, just as whether Barnum will be successful on the merits in its suit against EPA does not affect whether Barnum has standing to pursue such a suit." *Id.* at 900 n.4; *see also id.* at 901 ("We do not think Barnum must allege that EPA is the sole source of the devaluation of its property.").

*Nuclear Information and Resource Service v. Nuclear Regulatory Commission* ("*NIRS*"), 457 F.3d 941 (9th Cir. 2006), upon which APHIS relies, is not to the contrary. In *NIRS*, we held that the plaintiffs had not alleged a concrete injury caused by the challenged Nuclear Regulatory Commission ("NRC") regulation, because none of the declarations from the plaintiff association's members

---

**[6]** In contrast to the prospective claim in *Salmon Spawning*, the retrospective claims were not redressable because the remedy sought was the undoing of a treaty with Canada, and the court could not influence the decision, which had already been made by the Executive Branch, to enter into that treaty. 545 F.3d at 1225–29.

"explain[ed] *in any way* how [the members'] health may be affected by this regulation," and because the plaintiff association's "interest (even if sufficiently concrete) in the health of its members also appear[ed] to be served, not harmed, by the enactment of the new regulations." *Id.* at 953, 954. We emphasized that this lack of injury was "dispositive of [the] appeal." *Id.* at 951. We went on to explain, however, that to the extent the plaintiffs were harmed by the existence of the NRC regulation, their injury was no longer redressable because the Department of Transportation had a regulation identical in effect to the challenged NRC regulation, and the statute of limitations for any challenge to the Department of Transportation regulation had already run. *Id.*at 955; *Nuclear Info. & Res. Serv. v. U.S. Dep't of Transp. Research & Special Programs Admin.*, 457 F.3d 956, 962–63 (9th Cir. 2006). In contrast, here, Nevada does not already have an independent predator damage management program that is entirely redundant with APHIS's in terms of its effect on WildEarth. And, even if Nevada did have such a program, nothing suggests that litigation challenging it would be time barred or otherwise precluded.

Nor does *Washington Environmental Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013), show that redressability is lacking here. In *Bellon*, we held that plaintiffs alleging concrete injuries from climate change had not satisfied the causation and redressability requirements for standing to challenge a failure to adequately regulate oil refineries in Washington because the alleged link between the absence of such regulation and climate change was too tenuous. *Id.* at 1141–47. *Bellon* did not involve a procedural right, so the redressability requirements there were not relaxed in the way they are here. *Id.* at 1145 (distinguishing *Massachusetts v.*

*EPA* on the ground that it involved a "procedural right"). In addition, causation was lacking because the defendant oil refineries were such minor contributors to global greenhouse gas emissions, and the independent third-party causes of climate change were so numerous, that the contribution of the defendant oil refineries was "scientifically indiscernible." *Id.* at 1143–44. Molde's injury, in contrast, has at most two causes, and APHIS contributes very discernibly to that injury. It is the program led by APHIS that is carrying out the hunting, trapping, poisoning, and other acts of predator damage management that detract from Molde's enjoyment of the outdoors.

The conclusion that Molde's (and thus WildEarth's) injury is redressable is bolstered by the fact that any independent predator damage management activities by Nevada are hypothetical rather than actual. What, if any, the extent of a Nevada predator damage management program would be if APHIS stopped its activity in Nevada is entirely a matter of speculation because Nevada currently has no such independent program. Nevada has stated, through the Mayer Letter, that it would implement some form of predator damage management if APHIS withdrew from Nevada. But the Mayer Letter states only that the Nevada Department of Wildlife would retain statutory responsibility for predator management if APHIS ceased its involvement. It does not describe what the Department of Wildlife would do to carry out that responsibility on its own. Nevada might adopt practices that would be less harmful to WildEarth's interests, or it might devote less funding to predator damage management than APHIS currently provides. Indeed, the Nevada environmental assessment found that, at a minimum, a Nevada-run program likely would greatly reduce aerial hunting and the killing of ravens, both of which would

partially redress Molde's injuries.  The notion that Nevada would replace everything APHIS currently does is therefore speculative at best.    Such speculation does not defeat standing.  *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 703 (9th Cir. 1993) ("Speculation that logging might not occur because of as yet unknown intervening circumstances, or because redrafting the EIS might not change the Secretary's decision to adopt [the challenged policy] as its owl management plan is not relevant to standing.").

## IV.    Conclusion

For the foregoing reasons, we **REVERSE** the district court's order dismissing this case for lack of standing and **REMAND** for further proceedings.[7]

---

[7] We address WildEarth's requests for jurisdictional discovery and judicial notice in a concurrently filed order.