The Memorandum clarified that the ten breeding pairs in each of the three recovery areas would have "a high probability of long-term persistence" provided that the overall wolf populations consisted of "[t]hirty or more breeding pairs comprising some 300+ wolves in a meta-population with genetic exchange between sub-populations." (AR-EA 16373.) The Memorandum further stated, "[t]he addition of a few extra pairs would add security to the population and should be considered in the post-EIS management planning. That could always be done as a periodic infusion if deemed necessary." (AR-EA 16373.)
Like the 1987 Wolf Plan, the 1994 EIS draws a connection between federal wolf control actions and the overall survival of wolves. With specific reference to livestock depredation, the 1994 EIS states "a responsive program to address conflicts between wolves and domestic livestock reduces the degree of livestock depredation by wolves, increases public acceptance of wolf populations which likely reduces illegal wolf mortality, and allows growth of wolf populations toward recovery levels." (AR-EA 16050.) The 1994 EIS further states:
Removal of problem wolves does more than stop the depredation; it relieves the pressures and antagonisms direct[ed] toward the total wolf population by those incurring losses and other members of the public. Timely response to actual depredations will alleviate the perception of government inaction that too often results in the indiscriminate killing of wolves. By responding quickly to resolve depredation problems, the overall wolf population will be in less danger from potential nonselective and illegal damage control.... [R]emoval of wolves demonstrating this undesirable behavior will promote public acceptance of wolves, will reduce overall impacts, and will allow population growth to recovery levels....
(AR-EA 16050.)
The 1994 EIS also addresses potential impacts of wolves on ungulate populations as follows:
If the [US]FWS determined wolves were causing unacceptable impacts on other listed species, or on specific ungulate populations and those impacts might have a negative impact on wolf recovery outside national parks and wildlife refuges, the [US]FWS, ADC, or [Wildlife Services] authorized agencies could capture *931 and move wolves from localized areas to resolve those conflicts.
(AR-EA 16051.)
In January 1995, the USFWS first reintroduced wolves to central Idaho. (AR-EA 18494-95.) USFWS started with fifteen wolves and added twenty more the following year. (AR-EA 18495.) USFWS estimates that by the end of 2000, the NRM population first met its numeric recovery goals of 30 breeding pairs and more than 300 wolves well-distributed among Idaho, Montana, and Wyoming. (AR-EA 16629.)
In response to the wolves' recovery and anticipating delisting, USFWS asked the states of Idaho, Montana, and Wyoming to prepare wolf management plans specifying how each state would manage wolves after delisting. USFWS approved Idaho's wolf management plan in January 2004. (AR-EA 9326.)
In February 2007, USFWS issued a final rule removing the NRM distinct population segment (DPS) of gray wolves from the list of federally-protected threatened and endangered species. (AR-EA 9178, 18482.) The NRM DPS includes all of Montana, Idaho, and Wyoming, the eastern third of Washington and Oregon, and a small part of north central Utah. (AR-EA 18483.)
In 2008, the United States District Court for the District of Montana enjoined the 2007 delisting rule on a preliminary injunction motion. See Defenders of Wildlife v. Hall , 565 F.Supp.2d 1160 (2008). The Montana district court held that USFWS acted arbitrarily and capriciously in delisting the wolf because it lacked evidence of genetic exchange between the three NRM sub-populations. Id. at 1163.
In October 2008, the 2007 delisting rule was vacated and remanded back to the USFWS for additional consideration. (AR-EA 18483.) In April 2009, the USFWS issued an amended final rule removing the NRM DPS of gray wolves from the endangered species list except for those wolves in Wyoming. (AR-EA 18481-18546.) At that time, the USFWS estimated that the NRM DPS contained approximately 1,639 wolves (491 in Montana, 846 in Idaho, and 302 in Wyoming) including 95 breeding pairs (34 in Montana, 39 in Idaho, and 22 in Wyoming). (AR-EA 18481.)
The 2009 USFWS delisting decision reexamined and reaffirmed the 1994 EIS recovery goals of: "[t]hirty or more breeding pairs comprising some 300+ wolves in a meta-population (a population that exists as partially isolated sets of subpopulations) with genetic exchange between subpopulations should have a high probability of long-term persistence." (AR-EA 18492.) However, the 2009 USFWS rejected the assumption that proof of genetic diversity was required to support the delisting decision. (AR-EA 18492-93.) Instead, the USFWS determined inter alia : (1) ongoing or confirmed genetic exchange is not required; (2) confirmed genetic exchange is difficult to prove given the recent common genetic history of the wolf population groups; (3) human-assisted migration management can be utilized in the future if genetic diversity becomes a concern; (4) human-assisted migration management has resulted in documented genetic exchange between the wolves in all three recovery areas; (5) there are no existing genetic or demographic problems in any of the recovery segments; and (6) the states (except Wyoming) agreed to utilize management strategies that will encourage genetic diversity; monitor wolf genetics; and, should it become necessary, conduct human-assisted migration management to achieve genetic diversity. (AR-EA 18492-93.)
Further, to ensure the NRM wolf population as a whole exceeds the recovery goal of 30 breeding pairs and 300 wolves, the 2009 USFWS delisting decision requires *932 that wolves in each of the states including Idaho "be managed for at least 15 breeding pairs and at least 150 wolves in mid-winter." (AR-EA 18490.) "This and other steps, including human-assisted migration management if required ... will maintain the NRM DPS's current meta-population structure." (AR-EA 18490.)
The 2009 USFWS delisting decision specifically noted that central Idaho provides "the greatest amount of highly suitable habitat" of any wolf population area, and assumed that the central Idaho wolf population would continue to function as a "core" population that would provide a constant source of dispersing wolves into surrounding areas. (AR-EA 18495, 18543.) Further, "[w]ithout core refugia areas like ... the central Idaho wilderness that provide a steady source of dispersing wolves, other potentially suitable wolf habitat is not likely to be capable of sustaining breeding pairs." (AR-EA 18543.)
The 2009 USFWS delisting decision also identifies three scenarios that could initiate a status review and analysis of whether relisting is warranted:
(1) If the wolf population for any one State falls below the minimum NRM wolf population recovery level of 10 breeding pairs of wolves and 100 wolves in either [sic] Montana, Idaho, and Wyoming at the end of the year; (2) if the portion of the wolf population in Montana, Idaho, or Wyoming falls below 15 breeding pairs or 150 wolves at the end of the year in any one of those States for 3 consecutive years; or (3) if a change in State law or management objectives would significantly increase the threat to the wolf population.
(AR-EA 18490-91.)
In 2010, the United States District Court for the District of Montana again vacated the 2009 USFWS delisting decision. Defenders of Wildlife v. Salazar , 729 F.Supp.2d 1207 (D. Mont. 2010). However, the 2009 delisting decision was later reinstated by congressional action on May 5, 2011. (AR-DNS 2776.) As a result, since 2011, wolves in Idaho are no longer listed and primary responsibility for managing wolves shifted from USFWS to IDFG and the Nez Perce Tribe. (AR-DNS 2776.)
2. IDFG Management of Wolves in Idaho
In 2002, the Idaho Legislative Wolf Oversight Committee prepared a Wolf Conservation and Management Plan (2002 State Wolf Plan). (AR-EA 2776, AR-EA 9493, AR-DNS 1901.) The 2002 State Wolf Plan was adopted by the Idaho Legislature and accepted by USFWS. (AR-DNS 2776.) On May 19, 2011, two weeks after delisting, the IDFG Commission directed IDFG to manage wolves as big game animals consistent with the goals and objectives of the 2002 State Wolf Plan. (AR-DNS 2776.)
The 2002 State Wolf Plan set a number of goals for managing wolves in Idaho, including inter alia : (1) managing the wolf population "at recovery levels that will ensure viable, self-sustaining populations until it can be established that wolves in increasing numbers will not adversely affect big game populations, the economic viability of IDFG, outfitters and guidelines, and others who depend in a viable population of big game animals"; (2) maintaining at least 15 breeding pairs; and (3) minimizing human conflicts by coordinating with Wildlife Services to achieve prompt response to notifications of wolf depredation and prompt resolution of conflicts. (AR-EA 9510.)
The 2002 State Wolf Plan specifically authorizes IDFG "to evaluate and use sport hunting or any other means necessary to maintain wolf populations at recovery levels that will ensure a viable, self-sustaining population until such time as all *933 impacts are known." (AR-EA 9511.) The 2002 State Wolf Plan further provides:
In the unlikely event the population falls below 10 packs, depredation will be addressed with nonlethal control unless unusual circumstances absolutely necessitate the use of lethal control to end the depredation problem. Except for lethal control measures, wolf management will revert to the same provisions that were in effect to recover the wolf population prior to delisting (50 CFR Part 17, page 80270).
(AR-EA 9511.)
On March 6, 2008, IDFG adopted a revised Wolf Population Management Plan ("2008 State Wolf Plan") to address managing wolf populations specifically for the first five years after delisting. (AR 488, 9175.) The 2008 State Wolf Plan set a variety of goals, including: (1) managing "for a self-sustaining, viable wolf population[ ];" (2) maintaining at least fifteen breeding pairs; (3) managing wolf populations to avoid adverse effects to big game populations; and (4) maintaining the wolf population at 2005-2007 levels (518-732 wolves). (AR 9175-9193.) The 2008 State Wolf Plan also specified the circumstances under which IDFG would permit hunting. (AR-EA 9203.)
In 2009 IDFG conducted a single wolf hunting and trapping season under the 2008 State Wolf Plan in which 188 wolves were killed before the District of Montana vacated the 2009 delisting decision. (Dkt. 1, ¶ 48; Dkt. 9, ¶ 48. On December 8, 2010, IDFG suspended the 2008 State Wolf Plan. (Dkt. 9, ¶ 65; AR-EA 9436.).
Since delisting in May 2011, IDFG has managed wolves pursuant to the 2002 State Wolf Plan. (AR-DNS 2776.) The wolf population in Idaho has been relatively stable under IDFG management. Between 2011 and 2015, the wolf population in Idaho was estimated to be: 768, 722, 684, 785, and 786. (AR-DNS 8810.)
3. Wildlife Services' Role in Wolf Management in Idaho.
In August 2010, Wildlife Services issued a draft EA on "Gray Wolf Damage Management in Idaho" ("Draft EA"). (AR-EA 2239). The Draft EA was revised in December 2010 ("Revised Draft EA"). (AR-EA No. 997.) Both were prepared in cooperation with IDFG. (AR-EA 58.)
Wildlife Services received over 100,000 comments in response to the draft EA. (AR-EA 522-949.) Plaintiffs specifically submitted comments arguing inter alia : (1) the analysis in the Draft EA and Revised Draft EA reflected an unwarranted bias in favor of lethal controls; (2) killing wolves to boost ungulate herds is improper and unjustified in the Lolo and Selway zones; (3) Wildlife Services had not explained how it would comply with managers' mandates on federal land where it planned to conduct its wolf management activities; and (4) Wildlife Services needed to prepare an EIS. Id.
In March 2011, Wildlife Services issued the revised and final 2011 EA. (AR-EA 51-194.) The EA was revised in light of events that occurred after the August 2011 EA was first issued. (AR-EA 52.) These events included litigation and proposed legislation potentially impacting the USFWS decision to delist wolves. (AR-EA 52.) Accordingly, the 2011 EA "analyzes the potential environmental impacts of alternatives for [Wildlife Services] involvement in gray wolf management for the protection of livestock and other domestic animals, wild ungulates, and human safety under the direction of the responsible wolf management agency (i.e. , either the USFWS or IDFG depending on the wolf status, or the decisions of the USFWS and Governor of Idaho)." (AR-EA 58.)
The 2011 EA identified three decisions to be made: (1) whether Idaho Wildlife Services should continue its involvement in *934 wolf damage management activities as currently practiced or should the program activities be expanded or reduced; (2) what mitigation measures should be continued or implemented; and (3) whether the proposed action would have significant impacts on the quality of the human environment and require preparation of an EIS. (AR-EA 80.) The 2011 EA then identified and analyzed five alternatives in detail:
(1) a "No Action" alternative, continuing the Wildlife Services wolf management program to protect livestock and other domestic animals conducted under the appropriate 10j rules and other procedures or guidance in place as authorized by USFWS or IDFG, as appropriate (including lethal and nonlethal methods of management with a preference for nonlethal methods);
(2) the "proposed action/ preferred alternative" of continuing the existing program while also assisting IDFG to protect ungulates in situations where IDFG has requested assistance after determining that wolves are impacting ungulate populations in a specific management area;
(3) continuing the current program and also assist IDFG with ungulate protection including the use of gas cartridges and breeding wolf sterilization as potential additional control methods;
(4) nonlethal wolf management only; and
(5) no wolf damage management by Wildlife Services in Idaho.
(AR-EA 103-06.) An additional seven alternatives were considered but not in detail. (AR 115-118).
Wildlife Services selected the preferred Alternative 2 in its final decision and concluded that this decision would have no significant impact on the environment. (AR 3-39.) Wildlife Services selected Alternative 2 for the following reasons: (1) it best enables the management agencies to provide prompt, professional assistance with human-wolf conflicts and will help maintain local tolerance for wolf recovery in Idaho; (2) it offers the greatest chance of maximizing effectiveness and benefits to resource owners and managers while minimizing cumulative impacts on the quality of the human environment; (3) it has the greatest chance of maximizing net benefits while minimizing adverse impacts to public health and safety; and (4) it offers a balanced approach to the issues of humaneness and aesthetics when all facets of these issues are considered. (AR-EA 12.)
In addition, as set forth in the D/FONSI, Wildlife Services agreed to adhere to Standard Operating Procedures detailed in the 2011 EA and annual monitoring to ensure that environmental impacts would remain as described in the 2011 EA. (AR-EA 12.) The environmental impacts specifically identified for continued monitoring are: Wildlife Services approved and authorized take of wolves and impacts on wolf populations, risk to non-target species, impacts on public and pet health and safety, the humaneness of methods to be used, and sociological issues. (AR-EA 12.)
STANDARD OF REVIEW AND STATUTORY FRAMEWORK
1. Summary Judgment
Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to withstand a motion for summary judgment, a party:
(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may *935 reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.
British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund , 882 F.2d 371, 374 (9th Cir. 1989) (citation omitted).
The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings" and "designate specific facts" in the record to show a trial is necessary to resolve genuine disputes of material fact. Id. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is mandated if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. See Celotex , 477 U.S. at 322, 106 S.Ct. 2548.
"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For summary judgment purposes, an issue must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute...to require a jury or judge to resolve the parties' differing versions of the truth at trial." Hahn v. Sargent , 523 F.3d 461, 464 (1st Cir. 1975) (quoting First Nat. Bank v. Cities Serv. Co. Inc. , 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ); see also British Motor Car , 882 F.2d at 374.
In considering a motion for summary judgment, the Court does not make findings of fact or determine the credibility of witnesses, Anderson , 477 U.S. at 255, 106 S.Ct. 2505 ; rather, it must draw all inferences and view all evidence in the light most favorable to the nonmoving party. Matsushita , 475 U.S. at 587-88, 106 S.Ct. 1348 ; Whitman v. Mineta , 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita , 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).
2. Administrative Procedures Act ("APA")
Judicial review of administrative agency decisions is made under the APA. 5 U.S.C. § 702. Such review is based on the administrative record compiled by the agency-not on independent fact-finding by the district court. Camp v. Pitts , 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). APA claims may be resolved via summary judgment pursuant to the standard set forth in Rule 56. See Nw. Motorcycle Ass'n v. United States Dept. Agric. , 18 F.3d 1468, 1472 (9th Cir. 1994).
3. National Environmental Policy Act ("NEPA")
NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA is a procedural *936 statute that "does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." San Diego Navy Broadway Complex Coalition v. United States Dept. of Def. , 817 F.3d 653, 659 (9th Cir. 2016) (quoting Muckleshoot Indian Tribe v. United States Forest Serv. , 177 F.3d 800, 814 (9th Cir. 1999) ) (internal quotation marks omitted). "NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." Pac. Coast Fed'n of Fishermen's Ass'n v. Blank , 693 F.3d 1084, 1088 (9th Cir. 2012) ; see also 42 U.S.C. § 4332.
The purpose of NEPA is: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." Northern Plains Res. Council, Inc. v. Surface Transp. Bd. , 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." Lands Council , 395 F.3d at 1027 (citation omitted).
A. Environmental Assessment ("EA") Requirements
An agency may first prepare an EA to decide whether the environmental impact is significant enough to warrant preparation of an EIS or if a FONSI should be issued. An EA is a "concise public document ... [that] [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. 1508.9. Where the agency concludes the action will not have a significant effect or where the effects will be mitigated to an insignificant level, the agency may prepare a FONSI in lieu of preparing an EIS. Envtl. Prot. Info. Ctr. v. United States Forest Serv. , 451 F.3d 1005, 1009 (9th Cir. 2006) ; Wetlands Action Network v. United States Army Corps of Eng'rs , 222 F.3d 1105, 1121 (9th Cir. 2000) ; 40 C.F.R § 1508.13. 40; C.F.R. 1508.9(a)(1).
B. EIS Requirements
"NEPA requires that an [EIS] be prepared for all 'major Federal actions significantly affecting the quality of the human environment.' 42 U.S.C.A. § 4332(2)(C)." Ocean Advocates v. United States Army Corps of Eng'r , 402 F.3d 846, 864-65 (9th Cir. 2005). "[A]n EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.' " Idaho Sporting Cong. v. Thomas , 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting Greenpeace Action v. Franklin , 14 F.3d 1324, 1332 (9th Cir. 1992) ). "To trigger this requirement a 'plaintiff need not show that significant effects will in fact occur,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient." Id. at 1150 (quoting Greenpeace , 14 F.3d at 1332 ).
DICUSSION
Plaintiffs claim Defendants decision to adopt the 2011 D/FONSI violated NEPA in three ways: (1) in issuing the 2011 EA, Defendants did not engage in a "hard look" analysis as required by NEPA; (2) Defendants should have prepared an EIS; and (3) given new information and circumstances that have arisen since the 2011 EA was issued, Defendants should have prepared a supplemental NEPA analysis. (Dkt. 16-1.) For relief, Plaintiffs generally request that the Court reverse and set aside the 2011 EA and DN/FONSI and order Defendants to comply fully with *937 NEPA before continuing with any wolf control actions. (Dkt. 16-1, p. 7.)
In response, Defendants argue: (1) Plaintiffs lack standing because they cannot show the relief they seek will redress their alleged injuries; (2) the 2011 EA properly examined the environmental impacts of Wildlife Service's wolf damage management activities in Idaho; (3) the 2011 D/FONSI was not arbitrary and capricious; and (4) the Wildlife Service's decision not to prepare a supplemental analysis is entitled to deference. (Dkt. 17.)
For the reasons set forth below, the Court finds that Plaintiffs lack standing because the relief they seek will not redress their injuries. The record reflects that if Wildlife Services stopped killing wolves in Idaho, other third parties, including IDFG, will fill that void.
1. Standing Requirements
Plaintiffs have the burden of demonstrating standing. Lujan v. Defs. of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing under Article III requires (1) a concrete, particularized, and actual or imminent injury ("injury") (2) that is fairly traceable to the challenged conduct ("causation") (3) and is likely to be redressed by a favorable ruling ("redressability"). Clapper v. Amnesty Intern. USA , 568 U.S. 398, 409, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) ; Steel Co. v. Citizens for a Better Env't , 523 U.S. 83, 104, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
To demonstrate standing to bring a procedural claim, such as one alleging a NEPA violation, a plaintiff "must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." Western Watersheds Project v. Kraayenbrink , 632 F.3d 472, 485 (9th Cir.2011). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc. , 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).
Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, "the causation and redressability requirements are relaxed." Western Watersheds Project , 632 F.3d at 485. "Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, could protect their concrete interests." Salmon Spawning & Recovery Alliance v. Gutierrez , 545 F.3d 1220, 1226 (9th Cir. 2008).
2. Plaintiffs' Alleged Substantive and Procedural Injuries
In this case, Plaintiffs bring four claims; (1) NEPA violation-Failure to prepare EIS; (2) NEPA Violation-Failure to take a hard look at effects of actions and alternatives; (3) NEPA Violations-Decisions not to supplement NEPA analysis; and (4) NEPA Violation-Failure to supplement 2011 Wolf EA. (Dkt. 1.) The gravamen of Plaintiffs' claims relate to Wildlife Service's "wolf killing program." (Dkt. 1, ¶¶ 1, 2,15.)
In terms of substantive harm, Plaintiffs allege as follows:
Plaintiffs and their members, supporters, and/or staff have suffered, and will foreseeably continue to suffer, direct injuries to their recreational, aesthetic, scientific, spiritual and other interests and activities as a result of Wildlife Service's wolf killing, trapping, and other activities in Idaho. They have been injured by Wildlife Services' wolf-killing in the Lolo zone and elsewhere in Idaho, which decreases their chances of seeing and hearing wolves in their natural habitat *938 in central Idaho, including in its wilderness.
(Dkt. 1, ¶ 18.) In terms of procedural harm, Plaintiffs further allege:
Plaintiffs and their members, supporters, and/or staff are also directly injured by Wildlife Services' consistent refusal to fully disclose and evaluate the environmental impacts of its activities in Idaho, including wolf killing, as NEPA requires. They are injured by Wildlife Services' failure to analyze or disclose the impacts of its wolf-killing activities on Wilderness, the Sawtooth National Recreation area (SNRA), and other special places, including direct, indirect, and cumulative impacts and alternatives. Plaintiffs and their members, supporters, and/or staff have a strong interest in ensuring that Wildlife Services complies with all applicable federal statutes and regulations, including NEPA. Plaintiffs have worked to reform Wildlife Services' activities throughout the United states, including Idaho, and have a strong interest in ensuring that Wildlife Services fully considers and discloses site-specific information about its activities to the public.
(Dkt. 1, ¶ 19.)
For relief, Plaintiffs seek declarations from the court that Defendants violated NEPA and/or the APA. (Dkt. 1, p. 26.) Plaintiffs also ask the court to reserve ruling on injunctive relief until a decision on the merits of their claim; however, such relief would include "ordering Wildlife Services to halt its wolf control and killing activities until it prepares an updated, valid NEPA analysis." (Dkt. 1, p. 27; Dkt. 16-1, p. 7.)
3. Plaintiffs' Record Offered in Support of Standing
Plaintiffs offer eight declarations in support of their summary judgment motion. (Dkts. 16-3-16-10.) These declarations come from the Plaintiff organizations' members and employees and generally address the following issues:
• Each individual's personal interest in wolf viewing and conservation. (Dkt. 16-3, ¶¶ 15-18; Dkt. 16-4, ¶ 5; Dkt. 16-5, ¶¶ 7, 15; Dkt. 16-6, ¶¶ 5-7; Dkt. 16-7, ¶¶ 8-16; Dkt. 16-8, ¶¶ 8, 12-16; Dkt. 16-9, ¶¶ 6-17; Dkt. 16-10, ¶¶ 7, 20-41.)
• Feelings that lethal wolf removal, including aerial gunning operations and in specific geographic areas, is "upsetting and wrong" and interferes with their enjoyment of the land. (Dkt. 16-3, ¶ 19; 16-5, ¶¶ 18-20; Dkt. 16-6, ¶ 16; Dkt. 16-7, ¶¶ 19-20; Dkt. 16-8, ¶ 6; Dkt. 16-9, ¶¶ 19-20; Dkt. 16-10.)
• General concerns about the ecosystem when apex predators, like wolves, are removed. (Dkt. 16-3, ¶ 21; Dkt. 16-3, ¶ 7; 16-5, ¶¶ 11, 21; 16-6, ¶ 17; Dkt. 16-7, ¶¶ 11, 16; Dkt. 16-8, ¶ 20; Dkt. 16-9, ¶¶ 9, 21; Dkt. 16-10, ¶¶ 16, 55-58.)
• Additional concerns that killing wolves will not help IDFG achieve its elk population objectives, because while predation is "a factor" in elk population fluctuation, loss of habitat is the "greatest factor." (Dkt. 16-5, ¶ 24.)
• Claims that Wildlife Services operates in secrecy and without the benefit of public input and a full EIS as required by NEPA. (Dkt. 16-3, ¶ 22; Dkt. 16-4, ¶ 10; Dkt. 16-5, ¶ 22; Dkt. 16-6, ¶ 18; Dkt. 16-7, ¶ 28; Dkt. 16-8, ¶¶ 21-24; Dkt. 16-9, ¶ 24; Dkt. 16-10, ¶¶ 16, 60.)
4. Plaintiffs Have Failed to Demonstrate Redressability
Defendants do not dispute that Plaintiffs have set forth sufficient facts in *939 support of finding an injury-in-fact. Therefore, assuming arguendo Plaintiffs have demonstrated a concrete injury, the causation and redressability requirements are relaxed. In terms of redressability, Plaintiffs need only show that the relief they seek "could protect their concrete interests." Salmon Spawning , 545 F.3d at 1226 (9th Cir. 2008).
Plaintiffs have not met their burden. Plaintiffs have not set forth sufficient facts in the record to support a finding that eliminating Wildlife Service's wolf management activities pending a full EIS will result in fewer wolf killings or more wolves being present in Idaho for their enjoyment.
Plaintiffs' declarations state that the harms they allege "would be lessened if Wildlife Services were ordered to stop its wolf killing" and consider the environmental impacts of its wolf killing activities in an open, public process. (Dkt. 16-3, ¶ 26; Dkt. 16-4, ¶¶ 10-11; Dkt. 16-5, ¶ 22.) As Jon Marvel succinctly stated:
The remedy for my injuries, and those suffered by other WWP [Western Watersheds Project] members, is for this Court to order Wildlife Services to prepare a fully NEPA-Complaint analysis through an EIS, and to halt Wildlife Service's wolf killing program in the meantime.
(Dkt. 16-7, ¶ 30.)
However, as discussed more fully below, ever since wolves were delisted in 2011, IDFG has been responsible for managing wolves in Idaho. IDFG can manage the wolf population levels through a variety of means, including but not limited to the immediate and lethal response to depredations currently performed through Wildlife Services. Further, the record shows that IDFG has the authority, technical capability, and funding necessary to take over lethal wolf management should Wildlife Services be enjoined from doing so. Thus, for the following four reasons, the Court finds enjoining or restricting Wildlife Services' from engaging in wolf management will do nothing to address Plaintiffs' concerns.
First, since delisting in 2011, IDFG is the agency responsible for managing the over-all population of wolves in Idaho. This authority is not completely unfettered. IDFG is limited by federal statutes and regulations, such as public land use laws; state law and regulations, including the 2002 State Wolf Plan; and IDFG's basic responsibility to ensure that wolf populations do not fall below levels necessary to ensure long-term survival of wolves and to prevent future relisting under the ESA. (AR-EA 18490-91; Final Rule, 76 Fed. Reg. 25,920 -93 (May 5, 2011).) However, IDFG enjoys a great deal of discretion.
Moreover, in the 2002 State Wolf Plan, approved by USFWS, Idaho committed to conducting wolf management activities and managing sport harvest to protect livestock and ungulates. (AR-DNS 1918.) After delisting, the IDFG Commission directed IDFG to manage wolves as big game animals under the 2002 State Wolf Plan. (Dkt. 16-2, ¶ 27.) Thus, IDFG has the specific authority to both use, or authorize the use of, lethal control of wolves to protect livestock and wild ungulate populations. (Dkt. 18-3, ¶ 3.)
Second, the Affidavit of Brad Compton, Assistant Chief of Wildlife for IDFG is unrefuted and clearly supports a finding that IDFG has, not only the authority, but also the ability to manage wolves in the same manner that Wildlife Services does without the assistance of Wildlife Services. (Dkt. 18-3.) IDFG does not contract exclusively with Wildlife Services to engage in lethal wolf removals. (Dkt. 18-3, ¶ 4.) IDFG has independent capabilities to perform wildlife control activities through agency personnel and independent contractors.
*940 (Dkt. 18-3, ¶ 5.) In addition, IDFG has price agreements in place for aerial support services for both wildlife monitoring and management. (Dkt. 18-3, ¶ 5.) Most importantly, IDFG has used and may use such services in the future to engage in lethal wolf control operations should Wildlife Services cease or reduce its wolf management activities. (Dkt. 18-3, ¶ 5.)
Third, the State of Idaho has the financial resources necessary to pay for future lethal control efforts. Plaintiffs acknowledge that in 2014 the Idaho Legislature created the Wolf Depredation Control Board to fund wolf control efforts. (Dkt. 16-2, ¶ 31; AR-DNS 2679.) "The Wolf Depredation Control Program acts as a conduit to pass moneys from the state, sportsmen, and livestock producers through the Wolf Depredation Control Board to the wildlife Services Program under the United States Department of Agriculture Animal and Plant Health Inspection Service." (AR-DNS 2679.) The Idaho Wolf Depredation Board has allocated over half a million dollars each year to fund these efforts. (Dkt. 16-2, ¶ 31.)
These funds "replace[d] federal funds that were no longer available because wolves in Idaho are not federally listed under the ESA." (AR-DNS 2774.) Moreover, these funds, as well as "funds from IDFG and the Idaho State Animal Damage Control Board collectively supported the majority of [wolf damage management] in Idaho in 2013 and the first seven months of 2014." (AR-DNS 2774.) In short, the state of Idaho currently pays for the majority of Defendants' wolf management efforts and IDFG can simply redirect those resources elsewhere to support its wolf management goals.
Fourth, IDFG manages wolves under an adaptive approach. As noted in the 2011 EA, IDFG follows a strategic plan referred to as "The Compass," which mandates an adaptive approach to managing wildlife to set harvest rules and regulations to achieve long-term sustainability of populations and habitat. (AR-EA 128; AR-EA 8975-8998.) Thus, as more wolves are removed for one reason, such as livestock or ungulate protection, fewer wolves would be removed for another reason, such as sport hunting and vice versa . (AR-EA 9390.)
In at least four of the declarations offered in support of their summary judgment motion, Plaintiffs acknowledge the role of IDFG in terms of both directing Wildlife Service's activities as well as managing the hunting and trapping or "sport harvest" of wolves. In particular, Greg Freistadt states:
The fact is ... the State of Idaho sets elk management objectives and directs Wildlife Services to carry out aerial gunning of wolves to help meet those objectives without the State of Idaho doing any sound environmental analysis or public involvement, such as NEPA requires of federal agencies. That makes it even more important for Wildlife Services to conduct its own independent, scientifically-based, and public analysis of its Idaho wolf killing operations in compliance with NEPA.
(Dkt. 16-3, ¶ 23.) Moreover, three other declarants recognize the role of private hunting and trapping on wolf populations in Idaho. Jon Marvel states:
The delisting of wolves under the ESA has resulted in the State of Idaho allowing extensive private hunting and trapping of wolves in central Idaho, which has cumulative impacts with Wildlife Services' wolf control actions that together have greatly reduced wolf presence and sharply diminished my ability, and that of other members of the public, to see and hear wolves in the wild in Idaho.
*941 (Dkt. 16-7, ¶ 24.) In addition, Richard Rosnak states, "I believe such killings [by Wildlife Services] also reduce my ability to view and hear wolves, particularly in combination with Idaho's long hunting and trapping season sanctioned by Idaho Department of Fish and Game." (Dkt. 16-9, ¶ 23.) Moreover, Kenneth Cole states, "It is much harder to view wolves in the past few years due to Wildlife Services' killing and Idaho's hunting season." (Dkt. 16-10, ¶ 76.)
Thus, on the record before it, the Court finds that an injunction banning Wildlife Services from killing wolves would not stop IDFG from killing the same number of total wolves in Idaho. Wildlife Services engages in wolf damage management only at the request of the responsible management agency or at the request of property owners subject to the responsible agency's authorization. (AR-EA 80.) If Wildlife Services is banned from killing wolves, IDFG could make up the difference either by: (1) lethally removing wolves itself or through independent contractors or (2) increasing the total number of wolves permitted to be taken during the hunting season. In short, Plaintiffs' fundamental injury-the killing of wolves-would not be redressed by the relief they seek in this lawsuit.
5. Ninth Circuit Case Law Supports the Court's Conclusion.
Plaintiffs rely heavily upon the Ninth Circuit case, WildEarth Guardians v. U.S. Dep't Agric. , 795 F.3d 1148 (2015). In that case, APHIS was sued and argued, as Wildlife Services does here, that "if federal involvement in predator management in Nevada ceased as a result of this lawsuit, Nevada would pick up where the federal government left off." Id. The district court granted summary judgment on this issue and the Ninth Circuit reversed the ruling reasoning as follows:
[T]he mere existence of multiple causes of an injury does not defeat redressability, particularly for a procedural injury. So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one multiple causes of the injury.
Id. at 1157.
However, in WildEarth Guardians the state's record of predator management activities was merely hypothetical. Id. at 1158. As the Ninth Circuit described:
[A]ny independent predator damage management activities by Nevada are hypothetical rather than actual. What, if any, the extent of a Nevada predator damage management program would be if APHIS stopped its activity in Nevada is entirely a matter of speculation because Nevada currently has no such independent program. Nevada has stated, through the Mayer Letter, that it would implement some form of predator damage management if APHIS withdrew from Nevada. But the Mayer Letter states only that the Nevada Department of Wildlife would retain statutory responsibility for predator management if APHIS ceased its involvement. It does not describe what the Department of Wildlife would do to carry out that responsibility on its own. Nevada might adopt practices that would be less harmful to WildEarth's interests, or it might devote less funding to predator damage management than APHIS currently provides. Indeed, the Nevada environmental assessment found that, at a minimum, a Nevada-run program likely would greatly reduce aerial hunting and the killing of ravens, both of which would partially redress Molde's injuries. The notion that Nevada would replace everything APHIS currently does is therefore speculative at best.
Id. at 1158-59.
In contrast, independent predator management activities by IDFG are not hypothetical.
*942 IDFG has already conducted lethal wolf control activities through use of IDFG personnel as well as independent contractors. (Dkt. 18-3, ¶ 5.) In addition, IDFG has price agreements in place for aerial support services from independent contractors including services IDFG has used and may use to perform lethal wolf control. (Dkt. 18-3, ¶ 5.) Moreover, IDFG can always allow more wolves to be taken in Idaho by allowing more hunting.
Finally, in contrast to the EA involved in WildEarth Guardians , the 2011 EA in this case provides that if Wildlife Services ceased all wolf damage management in Idaho, other agencies or citizens will take over and conduct the same lethal and nonlethal methods of wolf management:
[T]he USFWS or IDFG and property owners would still be able to use lethal and nonlethal methods in accordance with federal regulations, State laws, as authorized by the USFWS or IDFG, whichever agency has management responsibility at the time. All requests for wolf damage management assistance received by [Wildlife Services] would be referred to the USFWS, IDFG, the Nez Perce Tribe, or other responsible management agency, as appropriate.
(AR-EA 12.)
The Court finds this case is more analogous to an unpublished Ninth Circuit case Goat Ranchers of Oregon v. Williams , 379 Fed. Appx. 662 (2010). In the Goat Ranchers case, the Ninth Circuit found Plaintiffs lacked standing because the State of Oregon was likely to continue a cougar control program even if Wildlife Services was enjoined from doing so. While the case is unpublished and without precedential value, it may be cited and is unpublished because it merely restates existing law. See Ninth Circuit Rules 36-2 & 36-3 . The relevant existing law is that plaintiffs cannot establish redressability if the relief they seek will not prevent a non-party from carrying on the same activity and it is likely that they will do so. Lujan , 504 U.S. at 568-70, 112 S.Ct. 2130 (finding redressability lacking because enjoining Secretary of Interior would not stop actions of other federal agencies contributing to alleged injury.)
In sum, Plaintiffs want to see more wolves alive and thriving in the Idaho outdoors. They believe enjoining Wildlife Services from killing wolves and vacating the 2011 EA will help ensure that this will happen. On the record before the Court at this time, the undersigned disagrees.
CONCLUSION
Wolves are no longer listed under the ESA in the State of Idaho. IDFG manages wolves and is responsible for maintaining their populations levels and setting population targets both throughout the state and in specific geographic areas. Moreover, IDFG contracts with and pays for Wildlife Services to conduct the lethal wolf management that is the subject of Plaintiffs' Complaint. Therefore, prohibiting Wildlife Services from engaging in lethal wolf management activities will not redress Plaintiff's injuries. IDFG can conduct these same activities itself or through third parties or simply allow more wolves to be taken through sport hunting and other means.
ORDER
NOW THEREFORE IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (Dkt. 16) is DENIED and Defendants' Cross Motion for Summary Judgment is GRANTED (Dkt. 18.) This matter is dismissed in its entirety.